UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDDY LEON GRADDY,

        Plaintiff,

v.                                      Case No.  8:12-cv-1882-T-24 EAJ

CITY OF TAMPA, ET AL.,

        Defendants.

_____/

## ORDER

This cause comes before the Court on cross motions for summary judgment: (1)

Defendants Barrett, Cornelius, and Smith's Motion for Summary Judgment (Doc. No. 56), which

Plaintiff opposes (Doc. No. 60); and (2) Plaintiff's Motion for Summary Judgment (Doc. No.

57), which Defendants Barrett, Cornelius, and Smith oppose (Doc. No. 63).  As explained below,

Plaintiff's motion is denied, and Barrett, Cornelius, and Smith's motion is granted in part and

denied in part.

## I.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The Court must draw all inferences from the evidence in the light most favorable to the

non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d

1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of

showing the Court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial.  See id. (citation omitted).  When a moving party has

discharged its burden, the non-moving party must then go beyond the pleadings, and by its own

affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background[1]

This case involves Plaintiff Eddy Leon Graddy's claims of unlawful seizure, excessive

force, and denial of medical treatment against Defendant police officers Robert Barrett,

Christopher Cornelius, and Chad Smith (collectively, "officers").  While the parties agree to

certain facts—that the officers stopped and asked Plaintiff (who was standing outside on a public

sidewalk) for his identification (to which he complied), asked to search him, and thereafter,

Plaintiff fled and was chased and tased, which resulted in injuries to Plaintiff's arm and

face—the parties dispute several of the details that affect the resolution of the pending motions

for summary judgment.  Accordingly, the Court will set forth the two conflicting versions of the

events.

### A.  Plaintiff's Version of the Events

On November 6, 2008, Plaintiff was at a domino hall called B&C Sundays, located at

1806 North Nebraska Avenue.  While there, people said that a police officer that they referred to

as "Batman" was outside.  (Doc. No. 49, p. 33).  Plaintiff went outside onto the sidewalk and

saw Barrett (who the people referred to as Batman) across the street on his bike.  (Doc. No. 49,

p. 33-34).  Thereafter, Plaintiff saw Smith and Cornelius drive by slowly a few times in their

police car.  (Doc. No. 49, p. 33-36).

Around 4:48 p.m., during their final drive by, Smith and Cornelius stopped their car, and

---

[1]All references to page numbers from a deposition refer to the deposition page number,
not the docket page number.

Smith opened the passenger door and asked for Plaintiff's identification. (Doc. No. 49, p. 35, 37, 37). Plaintiff complied and gave Smith his identification. (Doc. No. 49, p. 36-37). During this exchange, Smith was in the passenger seat with one leg out of the door, Cornelius was in the driver's seat, and Barrett was still across the street. (Doc. No. 49, p. 37).

Smith took Plaintiff's identification and ran it through the computer in the police car.[2] (Doc. No. 49, p. 37). Smith then asked if he could search Plaintiff. (Doc. No. 49, p. 39). By this time, Barrett had crossed the street and was standing behind and off to the side of Plaintiff. (Doc. No. 49, p. 39-40). Plaintiff responded that he did not want to be searched, because he did not have anything on him and his kids would be coming by and he did not want his kids to see him being searched. (Doc. No. 49, p. 40). In response, Barrett said, "We're going to search you your way or our way." (Doc. No. 49, p. 40-41). Plaintiff perceived Barrett's statement as suggesting that a search done their way would be "physical" and that he would be "roughed up." (Doc. No. 49, p. 41).

At this time, Cornelius got out of the car and went around the back of the car towards Plaintiff. (Doc. No. 49, p. 41-43). Plaintiff describes the scene as Smith inside the passenger side of the car with his leg outside the car and Barrett and Cornelius getting closer and "closing in." (Doc. No. 49, p. 41-44). Next, Plaintiff saw Barrett reach for his belt, and Plaintiff thought that Barrett was reaching for his gun, so Plaintiff ran away from the officers. (Doc. No. 49, p. 44-45). The next thing that Plaintiff remembers is waking up on the ground (because he later learned that Cornelius had deployed his taser on Plaintiff's back after Plaintiff ran away). (Doc.

---

[2]The Officer/Unit Activity Search report indicates that this was done at 4:48 p.m. (Doc. No. 60-3, p. 7).

No. 49, p. 48).

As Plaintiff woke, he saw the three officers standing over him.  (Doc. No. 49, p. 49).  The officers walked Plaintiff back to the police car, and Smith put handcuffs on Plaintiff behind his back.  (Doc. No. 49, p. 51, 71).  Plaintiff was arrested and charged with: (1) possession of a controlled substance, (2) possession of a controlled substance with intent to deliver, (3) tampering with evidence, (4) obstructing or opposing without violence, and (5) possession of a controlled substance within 1,000 feet of a church.  Plaintiff denies that he had any drugs on him at any time.  (Doc. No. 49, p. 51).  The arrest occurred at 4:52 p.m.  (Doc. No. 44, p. 102-03; Doc. No. 60-3, p. 7).

Plaintiff contends that as a result of the fall, his left arm was obviously mangled, which would have been apparent to anyone who saw it.  (Doc. No. 60-1, ¶ 7-8).  He further contends that when the officers helped him up from the ground, they intentionally picked him up from his right side.  (Doc. No. 60-1, ¶ 6).

After Plaintiff was put in the back of the police car, he started complaining to Cornelius about his arm hurting.  (Doc. No. 49, p. 53-54).  This is the first time during this incident that Plaintiff complained about his arm hurting.  (Doc. No. 49, p. 54).

At some point, Tampa Fire Rescue arrived on the scene (because they are called whenever a taser is discharged), and a female paramedic asked Plaintiff (while he was in the back of the police car) if he needed to go to the hospital.  (Doc. No, 49, p. 55-56; Doc. No. 44, p. 100).  Plaintiff responded that his arm was broken, that he could hear his bones crackling, and that his arm was hurting.  (Doc. No. 49, p. 55).  Before the paramedic could respond, Smith stated, "He's a tough guy.  He's all right.  There ain't nothing wrong with him.  He's a bad egg."

(Doc. No. 49, p. 55).

At some point, Plaintiff was let out of the police car so that the paramedic could look at his arm.  (Doc. No. 49, p. 56).  Plaintiff kept saying to look at his left arm.  (Doc. No. 49, p. 56).  Plaintiff heard Smith say "enough of that" and "he's all right."  (Doc. No. 49, p. 58, 60; Doc. No. 48, p. 7).  The paramedics asked that Plaintiff's handcuffs be removed, but their request was denied.[3]  (Doc. No. 56-1, p. 3).  Plaintiff was put back in the police car, and Tampa Fire Rescue left the scene.  (Doc. No. 49, p. 59).

Cornelius and Smith transported Plaintiff from the scene, but they did not drive directly to the jail.  Instead, they first stopped at a club called the Blue Note.  (Doc. No. 49, p. 67).  Thereafter, they made a stop at GameWorks for about thirty minutes.  (Doc. No. 49, p. 68).  After stopping at GameWorks, Cornelius and Smith took Plaintiff to the jail.  (Doc. No. 49, p. 69).  During the ride, Plaintiff was crying in pain.  (Doc. No. 49, p. 70).  Plaintiff asked the officers to loosen the handcuffs because he was in extreme paid, but they ignored his request.  (Doc. No. 60-1, ¶ 9-10).

According to the Officer/Unit Activity Search report, Plaintiff arrived at the jail at 5:41 p.m., 49 minutes after he was arrested.  (Doc. No. 60-3, p. 7).  However, according to Smith, the drive from 1806 North Nebraska Avenue directly to the jail should take about ten minutes.  (Doc. No. 47, p. 152).

At the jail, Plaintiff was seen by a nurse.  (Doc. No. 49, p. 71).  While with the nurse, Plaintiff saw that his face was all scraped up.  (Doc. No. 49,p. 71-73; Doc. No. 48, p. 24).  The

---

[3]The record is unclear regarding who denied the request that Plaintiff's handcuffs be removed.  (Doc. No. 56-1, p. 3).

nurse told somebody to take the handcuffs off of Plaintiff, and once the handcuffs were removed, Plaintiff's arm was shaped like a snake and just dropped.  (Doc. No. 49, p. 71-72).  Even Cornelius acknowledged during his deposition that when the handcuffs were removed, it was obvious that something was wrong with Plaintiff's arm.  (Doc. No. 46, p. 254).  The nurse began yelling at the officers and asking why Plaintiff was brought to the jail in this condition.  (Doc. No. 49, p. 72).  The nurse attempted to temporarily fix Plaintiff's arm and told the officers to take Plaintiff to the hospital and not to handcuff him.  (Doc. No. 49, p. p. 72).  Smith and Cornelius rushed Plaintiff to the hospital.  (Doc. No. 49, p. 73-74).  The hospital determined that Plaintiff had a Galeazzi fracture of his left forearm and that surgery was required.  (Doc. No. 56-2; Doc. No. 56-3).

### B.  The Officers' Version of the Events

Based on the deposition testimony of the officers, as well as the typed police report,[4] the officers describe the events as follows.  On November 6, 2008, Cornelius and Smith received a tip that an African American male in his thirties, wearing a white shirt, blue jeans, and a black baseball cap turned backwards, was selling crack that he carried in his pocket outside of 1806 North Nebraska Avenue.[5]  (Doc. No. 57-1, p. 14).  Later, Smith and Cornelius observed Plaintiff outside of 1806 North Nebraska Avenue.[6]  (Doc. No. 57-1, p. 14). The Tampa Police Department

---

[4]The typed police report is titled, "Tampa PD General Offense HardCopy."  (Doc. No. 57-1, p. 14-15).  There is also a shorter, handwritten criminal report affidavit.  (Doc. No. 57-1, p. 9).

[5]Plaintiff is an African American male who was forty-five years old at the time and contends that he was wearing a red shirt, jean shorts, and a red or black baseball cap.  (Doc. No. 49, p. 51-52; Doc. No. 44, p. 170).

[6]That is the address for a structure that contains both B&C Sundays and a boarding house.  (Doc. No. 44, p. 62-63).

had a written trespass authorization for that address.  (Doc. No. 57-1, p. 14).

Smith and Cornelius contacted Barrett and asked Barrett to meet up with them.  (Doc. No. 44, p. 60).  According to Barrett, when they met up, Smith and Cornelius told Barrett about the tip and that "they wanted to see if they had enough to initiate a stop and frisk."  (Doc. No. 44, p. 66, 74-75, 120).  According to Cornelius, Smith and Cornelius told Barrett that they wanted to conduct a consensual search.  (Doc. No. 45, p. 125).  Barrett agreed to assist Smith and Cornelius, and Smith and Cornelius identified Plaintiff as the person described in the tip.  (Doc. No. 44, p. 75).

Cornelius, Smith, and Barrett made contact with Plaintiff outside of B&C Sundays on the sidewalk and asked his name.  (Doc. No. 57-1, p. 14; Doc. No. 44, p. 80-81; Doc. No. 45, p. 119). The officers also asked Plaintiff why he was loitering outside.[7]  (Doc. No. 57-1, p. 14).  According to the police report, Plaintiff was unable to dispel the officers' alarm.  (Doc. No. 57-1, p. 14).  Cornelius stated during his deposition that they were "alarmed" because they did not know why Plaintiff was standing on the sidewalk at a location where the officers had a trespass authorization.[8]  (Doc. No. 45, p. 130-33).

---

[7]In his deposition testimony, Cornelius described this initial encounter as a temporary detention (as opposed to a voluntary encounter), because the officers had a trespass authorization for the address where Plaintiff was located and they wanted to determine why Plaintiff was loitering there.  (Doc. No. 45, p. 128-30).  Smith also described the situation as being a non-consensual encounter and that Plaintiff was being detained.  (Doc. No. 47, p. 161, 180).

[8]However, Cornelius cannot remember the specific conversation that he had with Plaintiff regarding why he was standing on the sidewalk.  (Doc. No. 45, p. 132).  While the officers contend that they did not know, at the time, whether Plaintiff had permission to be on the property, it is undisputed that Plaintiff, in fact, was allowed at B&C Sundays.  Additionally, the Court notes that the evidence is not clear regarding whether the trespass authorization covered only the boarding house at the address, or both the boarding house and B&C Sundays.

However, according to Barrett, Plaintiff did not appear to be trespassing or loitering. (Doc. No. 44, p. 125, 130, 137, 171).  Furthermore, the officers did not suspect that Plaintiff had a weapon or that he was dangerous, nor did they see him do anything illegal.  (Doc. No. 44, p. 84-85, 125, 130, 137, 171; Doc. No. 45, p. 124-25, 138, 140-41; Doc 46, p. 239, 245; Doc. No. 47, p. 138, 140-41).

According to Barrett, Plaintiff asked why he was being stopped, and after Smith and Cornelius tried to explain the situation, Barrett began to explain the "Stop and Frisk" law to Plaintiff.[9]  (Doc. No. 44, p. 82, 86, 125).  During Barrett's explanation of a stop and frisk, Plaintiff ran away from the officers.[10]  (Doc. No. 57-1, p. 14).

Smith and Cornelius chased Plaintiff on foot and ordered him to stop numerous times. (Doc. No. 57-1, p. 14; Doc. No. 44, p. 93). Plaintiff refused to stop running.  (Doc. No. 57-1, p. 14). According to the police report, Cornelius saw Plaintiff reach into the front of his pants with his left hand and pull out a clear plastic baggy.  (Doc. No. 57-1, p. 14).  Smith notes in the police report that narcotics are commonly contained in plastic baggies.  (Doc. No. 57-1, p. 14).

---

[9]At their depositions, Cornelius and Smith acknowledged that a stop and frisk was not permissible at this point in the encounter.  (Doc. No. 45, p. 136-37, 180; Doc. No. 47, p. 164-65). Smith acknowledged during his deposition that it was "odd" that Barrett was explaining the stop and frisk law to Plaintiff when the officers were not permitted to actually frisk at that point in the encounter.  (Doc. No. 47, p. 168, 180).  However, Cornelius stated at his deposition that Plaintiff was not allowed to leave the encounter at this time, because Plaintiff had not provided a legitimate reason for being where he was.  (Doc. No. 45, p. 136-37, 180).

[10]When asked at his deposition whether Plaintiff was free to leave the encounter when he ran, Barrett responded that he had no reason to detain Plaintiff but that he [Barrett] believed that it was Cornelius and Smith's intent to detain Plaintiff to investigate the drug tip.  (Doc. No. 44, p. 87).  However, Cornelius and Smith stated at their depositions that they stopped Plaintiff because he was loitering, not because of the drug tip.  (Doc. No.. 46, p. 232; Doc. No. 47, p. 128).

However, during his deposition, Cornelius more specifically stated that he saw Plaintiff pull out a baggy containing a white substance. (Doc. No. 45, p. 148, 157-58, 173).

In order to deter Plaintiff from destroying evidence and to apprehend him, Cornelius deployed his taser, which struck Plaintiff in his back and caused him to fall. (Doc. No. 57-1, p. 14; Doc. No. 45, p. 148, 157-59). As a result of the fall, Plaintiff sustained minor to moderate abrasions to his face, left wrist, and arm. (Doc. No. 57-1, p. 14; Doc. No. 45, p. 164).

Smith recovered the plastic baggy, which contained an off white color, rock-shaped substance from underneath Plaintiff's stomach. (Doc. No. 57-1, p. 14). The substance tested positive for cocaine and weighed approximately 12.1 grams. (Doc. No. 57-1, p. 15).

Paramedics arrived at the scene, treated Plaintiff's injuries, and determined that Plaintiff was cleared to go to booking, as opposed to the hospital. (Doc. No. 57-1, p. 15). According to Smith, he did not perceive Plaintiff as being significantly injured. (Doc. No. 47, p. 145). Cornelius contends that he and Smith drove Plaintiff directly to the jail, and they did not stop at the Blue Note or GameWorks. (Doc. No. 46, p. 250). Upon arriving at the jail, the nurse that saw Plaintiff indicated that Plaintiff had suffered a broken left wrist and needed to go to the hospital. (Doc. No. 57-1, p. 15). Plaintiff was taken to the hospital for treatment. (Doc. No. 57-1, p. 15).

### C. Plaintiff's Complaint

In his amended complaint, Plaintiff asserts seven claims against the officers (in their individual capacities) and Defendant City of Tampa ("City"). (Doc. No. 19). Specifically, Plaintiff asserts the following claims: (1) a § 1983 unlawful seizure claim against the City, (2) a § 1983 unlawful seizure claim against the officers, (3) a § 1983 excessive force claim against

the officers, (4) a § 1983 excessive force claim against the City, (5) a denial of medical treatment

claim against the officers, (6) a claim of assault and battery against the City, and (7) a negligence

claim against the City.

## III.  Motion for Summary Judgment

Plaintiff and the officers have filed cross motions for summary judgment.  Accordingly,

the Court will analyze each motion.

### A.  Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment solely on his claim against the officers that they

subjected him to an unlawful seizure when they initially stopped him (i.e., the encounter prior to

Cornelius deploying his taser on Plaintiff).[11]  The officers oppose the motion, arguing that

Plaintiff was not seized prior to Cornelius deploying his taser on Plaintiff.  As such, the issue

before the Court is whether Plaintiff was seized prior to Cornelius deploying his taser on

Plaintiff.

Before analyzing whether a seizure occurred or whether Plaintiff participated in a

consensual encounter, the Court briefly describes the types of encounters that can occur between

the public and the police:

> There are three broad categories of encounters between police and
> citizens for purposes of the Fourth Amendment: (1) police-citizen
> exchanges involving no coercion or detention; (2) brief seizures or
> investigatory detentions; and (3) full-scale arrests.  The first type of
> encounter, commonly referred to as a consensual encounter, does not
> constitute a "seizure" sufficient to implicate the Fourth Amendment.
> Law enforcement officers do not violate the Fourth Amendment's

---

[11]In Plaintiff's motion, he states that whether he pulled a baggy out of his pocket
following the initial encounter is irrelevant for the purpose of this motion, which is directed at
whether the initial encounter was an unlawful seizure.  (Doc. No. 57, p. 5, n.6).

prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when the police have no basis for suspecting an individual of wrongdoing, they may pose questions and ask for identification, provided that they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he has not been seized.[12]

Factors relevant to determining whether a police-citizen encounter was consensual or amounted to a seizure include, among other things: whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police. An officer's display of his badge and the presence of a uniform and holstered firearm are accorded little weight in the analysis, as the public knows that most officers are armed and are often required to wear uniforms. Ultimately, a Fourth Amendment "seizure" only occurs when a person's freedom of movement is restrained by means of physical force or by submission to a show of authority.

U.S. v. Allen, 447 Fed. Appx. 118, 120 (11th Cir. 2011)(internal citations and quotation marks omitted).

Prior to Cornelius deploying his taser on Plaintiff, the encounter consisted of two parts: (1) the police asking Plaintiff questions, and (2) Plaintiff running away from the officers. As explained below, neither part of the encounter consisted of a seizure.

### 1. Initial Questioning

It is clear to the Court that when the officers first approached Plaintiff and asked his name, for his identification, and why he was loitering outside, such was a consensual encounter. At that point, (1) Plaintiff's path was not blocked, (2) the length of questioning was brief, (3)

---

[12]"[T]he 'reasonable person' test presupposes an *innocent* person." Florida v. Bostick, 501 U.S. 429, 438 (1991).

there was no physical touching of Plaintiff, (4) there was no display of weapons or show of authority by the officers, and (5) no other coercive means were used by the officers.

Plaintiff, however, contends that the initial encounter became a detention, as evidenced by Barrett's statement, after asking Plaintiff if they could search him, that "We're going to search you your way or our way" and that Barrett and Cornelius got closer to Plaintiff and were "closing in." (Doc. No. 49, p. 40-44). Plaintiff adds that during their depositions, both Cornelius and Smith described the encounter as being a non-consensual detention and that Barrett believed that Plaintiff was being detained. (Doc. No. 45, p. 128-30; Doc. No. 47, p. 161, 180; Doc. No. 44, p. 87).

The flaw in Plaintiff's argument is three-fold. First, the officers deny that Barrett made the alleged statement or that they were closing in on Plaintiff; thus, a disputed issue of material fact exists. (Doc. No. 44, p. 86, 89-90, 167, 177; Doc. No. 45, p. 136, 138; Doc. No. 47, p. 166). Second, the officers' subjective intent is irrelevant to the extent that it was not communicated to Plaintiff during the encounter. See U.S. v. Fry, 622 F.2d 1218, 1220 n.6 (5th Cir. 1980)(stating that the subjective intent of the DEA agent to detain the subject is irrelevant except insofar as that intent was conveyed to the subject); Brendlin v. California, 551 U.S. 249, 260-61 (2007)(stating that the intent that counts under the Fourth Amendment is the intent that has been conveyed to the subject and that courts do not look at the subjective intent of the officers when determining whether the subject's freedom of movement has been restricted).

Third, and in connection with the officers' motion for summary judgment, even if the Court accepted only Plaintiff's version of the facts as true, he has not shown that the initial consensual encounter became a detention. Specifically, Plaintiff has not shown that his freedom

of movement was restrained by means of physical force or by submission to a show of authority. Instead, no physical force was used and Plaintiff fled in response to the officers' show of authority (i.e., when the officers were closing in and Barrett allegedly said that they were going to search Plaintiff his way or their way and/or started to describe the stop and frisk law, Plaintiff ran away). Thus, Plaintiff's failure to **submit** to the officers' show of authority undermines his claim that he was seized during this part of the encounter. See Brendlin, 551 U.S. at 254 (stating that "there is no seizure without actual submission"); Gainor v. Douglas County, Ga., 59 F. Supp.2d 1259, 1265, 1270-71, 1271 n.14 (N.D. Ga. 1998)(finding that the plaintiff was not seized when the officer told the plaintiff to stand in front of the police car, because the plaintiff refused the officer's directive and walked away). Accordingly, Plaintiff's motion for summary judgment on this issue must be denied, because he has not shown that he was unlawfully seized during this part of the encounter.

## 2. Running Away

The case law is clear that once Plaintiff ran away from the officers, he was not seized until Cornelius deployed his taser on Plaintiff. See California v. Hodari D., 499 U.S. 621, 629 (1991)(concluding that there was no seizure during the officer's pursuit of the subject); U.S. v. Shepard, 423 Fed. Appx. 941, 943 n.2 (11th Cir. 2011)(stating that a fleeing person is not seized). As such, Plaintiff is denied summary judgment to the extent that he argues that he was unlawfully seized while running away from the officers.

## B. The Officers' Motion for Summary Judgment

The officers move for summary judgment on the three claims asserted against them: (1) § 1983 unlawful seizure, (2) § 1983 excessive force, and (3) denial of medical treatment.

Accordingly, the Court will analyze their motion with respect to each claim.

### 1.  Unlawful Seizure

The officers argue that there was no unlawful seizure because the initial encounter with Plaintiff was consensual, and there was probable cause for the seizure that occurred when Cornelius deployed his taser and Smith handcuffed Plaintiff.  The Court agrees with the officers that the initial encounter was consensual, as described above in connection with the Court's analysis of Plaintiff's motion for summary judgment.

With regard to the officers' argument that probable cause existed at the time of the tasing, the officers state that Cornelius saw Plaintiff pull a baggy, which Cornelius recognized as drug paraphernalia, from his pants and Cornelius assumed, based on his experience, that Plaintiff was going to attempt to get rid of the baggy. Thus, the officers argue that Cornelius deployed his taser to prevent the destruction of evidence and to detain/arrest Plaintiff subsequent to determining that there was arguable probable cause that a crime had been committed.

After considering the evidence in the light most favorable to Plaintiff, the Court concludes that genuine issues of material fact exist regarding whether there was arguable probable cause for the seizure that occurred after Plaintiff fled.  According to Plaintiff, he did not have any drugs on his person and did not attempt to discard any drugs while fleeing from the officers.[13]  Thus, accepting Plaintiff's version of the facts as true, there is no basis for concluding that arguable probable cause existed when Cornelius deployed his taser.

_____

[13]Even if the Court discounted Plaintiff's assertion that he did not have drugs on his person (which the Court is not doing), there would still remain a question of fact regarding whether Plaintiff removed the drugs from his pants while fleeing, which is the basis for Cornelius' arguable probable cause.  Thus, summary judgment on this claim is not appropriate.

The officers make the additional argument that even if the Court finds that probable cause was lacking, the Court should grant Barrett and Smith summary judgment based on their specific involvement in the allegedly unlawful seizure.  With regard to Barrett, the officers argue that Barrett was not involved after Plaintiff ran from the officers, and as such, Barrett did not seize Plaintiff.  This is a disputed issue of fact, as Plaintiff testified during his deposition that when he woke up on the ground after being tased, all three officers were standing over him and they all walked Plaintiff to the police car, where Smith handcuffed him.  (Doc. No. 49, p. 49, 51, 71).  As such, the Court concludes that Barrett is not entitled to summary judgment on Plaintiff's unlawful seizure claim.

With regard to Smith, the officers argue that even though Smith handcuffed Plaintiff (and thus, he was directly involved with Plaintiff's seizure), Smith had arguable probable cause to do so under the fellow officer rule.  The fellow officer rule has been explained as follows:

> Florida courts apply the fellow-officer rule when the arresting officer was absent for a significant portion of the events that gave rise to probable cause.  It is reasonable for an officer in that situation to rely upon his fellow officer's judgment about probable cause.  The rule typically requires that the fellow officer actually communicate to the arresting officer the basis for probable cause.  When the arresting officer observed the same events as his fellow officer, the fellow-officer rule does not apply.

Killmon v. City of Miami, 199 Fed. Appx. 796, 800 (11th Cir. 2006)(internal citations omitted).

Another court has explained:

> The fellow officer rule provides a mechanism by which officers can rely on their collective knowledge to act in the field.  Under this rule, the collective knowledge of officers investigating a crime is imputed to each officer and one officer may rely on the knowledge and information possessed by another officer to establish probable cause. . . .  In other words, an officer in the field may need to act immediately based upon what he or she is told by a fellow officer.

State v. Bowers, 87 So.3d 704, 707-08 (Fla. 2012).

Smith does not contend that he saw Plaintiff pull a baggy out of his pants while running from the officers.[14]  (Doc. No. 47, p. 109-10).  However, the officers argue that even if both Smith and Cornelius did not see Plaintiff throw a baggy of cocaine while running from the officers, Smith had probable cause to arrest Plaintiff based on Cornelius' statement to Smith that Plaintiff had thrown the baggy of cocaine, even if Cornelius' statement was a lie.  See Williams v. Miami-Dade Police Department, 297 Fed. Appx. 941, 946 (11th Cir. 2008)(stating that the officers who received allegedly falsified information regarding probable cause from a third officer were justified on relying on the third officer's representation, because the receiving officers did not know that the third officer's representation might be false).

The flaw in this argument is that the officers do not point to record evidence regarding what Cornelius said, if anything, to Smith regarding Plaintiff pulling a baggy of cocaine out of his pants prior to Smith handcuffing Plaintiff.  Furthermore, it is not clear whether Smith witnessed everything that Cornelius witnessed, because if they both were able to see Plaintiff flee (and both were able to see if Plaintiff pulled a baggy out of his pants), the fellow officer rule would not apply.  See Kilmon, 199 Fed. Appx. at 800 (stating that "[w]hen an officer is present with a fellow officer and both observe the same course of events, it is unreasonable for an officer to rely upon the fellow-officer rule to determine that probable cause exists").  As such, Smith is not entitled to summary judgment on the unlawful seizure claim.

---

[14]Smith's deposition testimony is not clear whether he could see Plaintiff the entire time or whether Cornelius was in Smith's line of sight, and Smith stated that he could not remember the incident and that he was testifying based on what the police report stated.  (Doc. No. 47, p. 109-10).

Accordingly, summary judgment on Plaintiff's unlawful seizure claim is denied to the extent that the claim is based Plaintiff's seizure after he fled from the officers.

## 2. Excessive Force

Plaintiff also asserts an excessive force claim against the officers due to Cornelius' tasing. Plaintiff's excessive force claim is asserted as an alternative to his unlawful seizure claim,[15] because an excessive force claim is asserted in connection with an otherwise lawful seizure.[16]  The officers move for summary judgment on the excessive force claim, arguing that Cornelius deployed his taser after he saw Plaintiff pull a plastic baggy, which Cornelius recognized as drug paraphernalia, from his pants and Cornelius assumed, based on his experience, that Plaintiff was going to attempt to get rid of the baggy. Thus, the officers argue that Cornelius deployed his taser to prevent the destruction of evidence and to detain/arrest Plaintiff subsequent to determining that there was arguable probable cause that a crime had been committed.  As such, the officers argue that they are entitled to qualified immunity for this claim.

The Court is mindful that it is required to view the facts in the light most favorable to Plaintiff in analyzing whether the officers are entitled to qualified immunity.  However, for the purpose of the excessive force claim, the Court must assume that there was probable cause to arrest Plaintiff and analyze whether the force used to effectuate that arrest was reasonable.

---

[15]The damages recoverable on an unlawful seizure claim include damages suffered because of the use of force in effecting the seizure.

[16]"An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force . . . in effecting an otherwise lawful arrest.  When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." Bashir v. Rockdale County, Georgia, 445 F.3d 1323, 1332 (11th Cir. 2006).

Therefore, for the purpose of analyzing this claim, the Court accepts that Plaintiff was running away from the officers while they were attempting to arrest him.  While the Court must assume that there was probable cause to arrest Plaintiff, the Court will view the facts in the light most favorable to Plaintiff and assume that probable cause only existed for a minor, non-violent crime.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Thus, "[a]n officer will be entitled to qualified immunity if his actions were objectively reasonable." Id. (citation omitted).

In determining whether the officers are entitled to qualified immunity, the officers must prove that they were acting within the scope of their discretionary authority.  See id. (citation omitted).  Plaintiff does not dispute this.

Next, the burden shifts to Plaintiff to show that qualified immunity is not appropriate. See id. (citation omitted). To do this, Plaintiff must show two things: (1) that the evidence, construed in Plaintiff's favor, shows a violation of a constitutional right, and (2) that the constitutional right at issue was clearly established at the time of the officers' conduct.  See Pearson v. Callahan, 555 U.S. 223, 232 (2009).

The determination of whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted."  Id. at 202 (citation omitted).  As the

Supreme Court has explained:

> [Q]ualified immunity operates "to ensure that before they are
> subjected to suit, officers are on notice their conduct is unlawful."
> For a constitutional right to be clearly established, its contours "must
> be sufficiently clear that a reasonable official would understand that
> what he is doing violates that right.  This is not to say that an official
> action is protected by qualified immunity unless the very action in
> question has previously been held unlawful, but it is to say that in the
> light of pre-existing law the unlawfulness must be apparent."

Hope v. Pelzer, 536 U.S. 730, 739 (2002)(internal citations omitted).

The officers argue that even if the tasing of Plaintiff constituted excessive force in

violation of the Fourth Amendment, it was not clearly established on November 6, 2008 that

tasing Plaintiff under the facts of this case constituted excessive force.  The Court agrees.

An excessive force claim requires the following analysis:

> As an excessive force claim, the constitutionality of [the officer's]
> conduct is judged under the Fourth Amendment's "objective
> reasonableness" standard.  The "reasonableness" of a particular use
> of force should be judged from the perspective of a reasonable officer
> on the scene, rather than with the 20/20 vision of hindsight.  The test
> for reasonableness is an objective one, without regard to the official's
> underlying subjective intent or motivation.  In deciding whether the
> use of force was reasonable, courts must "'balance the nature and
> quality of the intrusion on the individual's Fourth Amendment
> interests against the importance of the governmental interests alleged
> to justify the intrusion.'"  The test for reasonableness requires close
> and careful attention to the facts and circumstances of each particular
> case.  In the Eleventh Circuit, to balance the need for the application
> of force, a court must look to, and evaluate, three factors . . . : (I) the
> severity of the crime at issue, (ii) whether the suspect poses an
> immediate threat to the safety of the officers or others, and (iii)
> whether he is actively resisting arrest or attempting to evade arrest by
> flight.

Steen v. City of Pensacola, 809 F. Supp. 2d 1342, 1349-50 (N.D. Fla. 2011)(internal citations

omitted).

The Court will assume without deciding that the tasing of Plaintiff while running away from officers that were trying to arrest him for a non-violent, minor offense constitutes excessive force.  The issue before the Court is whether it was clearly established on November 6, 2008 that tasing Plaintiff under such circumstances constituted excessive force.  The Court concludes that it was not.

In determining whether the law was clearly established, this Court must determine "whether the law gave the officer[s] 'fair warning' that [their] conduct would be clearly unlawful."  Id. (citations omitted).  As one court has explained:

> A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right;[17] or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.[18]

German v. Sosa, 399 Fed. Appx. 554, 556 (11th Cir. 2010)(quotation marks and citation omitted).

On November 6, 2008, there were two published Eleventh Circuit cases analyzing whether the use of a taser on a suspect constituted excessive force, and both cases concluded that the use of the taser was not excessive force.  See Draper v. Reynolds, 369 F.3d 1270 (11th Cir.

---

[17]The second method has been described as a broad statement of principle so clear that every objectively reasonable officer facing the circumstances would know that the officer's conduct violated federal law when the officer acted.  See Steen, 809 F. Supp. 2d at 1356.

[18]Some courts conflate the second and third methods into one method referred to as the "obvious clarity" exception, which is a "'narrow exception to the normal rule that only case law and specific factual scenarios can establish a violation.'"  Steen, 809 F. Supp. 2d at 1353, 1354 (quoting Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011)).  This method asks "whether it would be clear to every reasonable officer, even in the absence of case law, that the force used . . . was excessive under the circumstances."  Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir. 2009).

2004); <u>Zivojinovich v. Barner</u>, 525 F.3d 1059 (11th Cir. 2008).  As explained below, these cases did not give the officers fair warning that the tasing of Plaintiff would be excessive force.

In <u>Draper</u>, the officer pulled over the plaintiff because his tag light on his truck was not appropriately lit.  <u>Draper</u>, 369 F.3d at 1272.  The officer asked the plaintiff for certain documents several times, and the plaintiff did not comply.  After asking for the documents a fifth time, the officer discharged his taser at the plaintiff's chest.  <u>See id.</u> at 1273.  The plaintiff sued the officer for excessive force, and the appellate court concluded that the use of the taser was reasonable, stating:

> In the circumstances of this case, [the officer's] use of the taser gun to effectuate the arrest of [the plaintiff] was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop, and did not constitute excessive force. From the time [the plaintiff] met [the officer] at the back of the truck, [the plaintiff] was hostile, belligerent, and uncooperative.  No less than five times, [the officer] asked [the plaintiff] to retrieve documents from the truck cab, and each time [the plaintiff] refused to comply. Rather, [the plaintiff] accused [the officer] of harassing him and blinding him with the flashlight.  [The plaintiff] used profanity, moved around and paced in agitation, and repeatedly yelled at [the officer]. Because [the plaintiff] repeatedly refused to comply with [the officer's] verbal commands, starting with a verbal arrest command was not required in these particular factual circumstances. More importantly, a verbal arrest command accompanied by attempted physical handcuffing, in these particular factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either [the plaintiff] or [the officer] would be seriously hurt. Thus, there was a reasonable need for some use of force in this arrest.
>
> Although being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury. Indeed, the police video shows that [the plaintiff] was standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him. The single use of the taser gun may well have prevented a physical struggle and serious harm to either [the plaintiff] or [the officer].

> Under the "totality of the circumstances," [the officer's] use of the
> taser gun did not constitute excessive force, and [the officer] did not
> violate [the plaintiff's] constitutional rights in this arrest.

Id. at 1278.

In Zivojinovich, a father and son went to a new year's party at a hotel, and the police were called because the son was allegedly being disruptive.  See Zivojinovich, 525 F.3d at 1062.  After the officers arrived, they escorted the father and son out of the party and into a stairwell, where a struggle ensued before the father and son were handcuffed.  See id. at 1064-65.  During the struggle, the officers broke the father's nose.  See id. at 1064.  As the officers led the father and son outside of the hotel, the father said to one of the officers, "How do you wake up in the morning and feel proud of who you are?"  See id. at 1065.  Because the father's nose was broken, he sprayed blood on the officer when he spoke.  See id.  The officer responded that the father was spitting blood on him, to which the father stated, "You think I am spitting blood at you.  You should have thought of that before you broke my nose."  See id.  In response, that officer and another officer deployed their tasers on the father's shoulders.  See id.

The father sued the officers for excessive force due to the officers tasing him.  See id. at 1073.  The appellate court concluded that the officers use of the taser was not excessive force, stating:

> The deputies clearly had probable cause to arrest [the father] for
> resisting an officer with violence, . . . , so the only issue here is
> whether the use of the taser guns was unreasonable. At the time the
> deputies used their taser guns, [the father's] nose had already been
> broken, and he sprayed blood when he spoke. [One officer] testified
> that he believed it was intentional.  Although we view the facts in the
> light most favorable to the non-moving party, and [the father]
> testified in his deposition that it was not intentional, we must treat it
> as though it were because the evidence is that is how it would appear
> to a reasonable officer at the scene.  We have previously held that in

> a "difficult, tense and uncertain situation" the use of a taser gun to
> subdue a suspect who has repeatedly ignored police instructions and
> continues to act belligerently toward police is not excessive force.
> This was such a situation, and we conclude that [the officer's] use of
> his taser gun was reasonably proportionate to the need for force.
> Because [the officer's] use of the taser gun while leading [the father]
> out of the [hotel] in handcuffs was not unreasonable, we do not reach
> the well-established prong of the qualified immunity analysis.

Id. (internal citations omitted).

Thus, based on Draper and Zivojinovich, the law regarding the use of tasers on

November 6, 2008 was that such use was not excessive force when done in response to a non-

compliant suspect.  The state of the law at that time did not provide fair warning that the use of a

taser on a suspect running away from the officers would constitute excessive force.

This Court notes that a similar conclusion was reached in Steen v. City of Pensacola.  In

Steen, on October 3, 2009, a seventeen year old boy was riding his bike down a sidewalk of a

four-lane street at 1:50 a.m.  Steen, 809 F. Supp.2d at 1344.  The officer saw the boy and

suspected him of operating a bicycle at night without proper lights, so the officer activated his

flashing overhead lights, yelled stop, and began to pursue the boy.  See id. at 1344 and n.3.  The

boy did not stop and the officer pulled alongside the boy and tased him.  See id. at 1344-45.  As

a result, the boy lost control of the bike and crashed in a vacant parking lot.  See id. at 1345.

The boy's mother filed suit alleging that the officer used excessive force when he tased

the boy.  The court concluded that the case law existing on October 3, 2009 did not give the

officer fair warning that his use of the taser on someone fleeing on a bicycle would be clearly

unlawful.  See id. at 1353.  Additionally, the court concluded that the obvious clarity exception

did not apply.  See id. at 1356.

The instant case is similar to the facts in Steen; both involved the use of a taser on a

fleeing person that was suspected of committing a minor, non-violent offense.  This Court agrees with the court in <u>Steen</u> that the state of the law on November 6, 2008 did not give officers fair warning that using a taser on someone fleeing would be clearly unlawful, nor does such a factual situation implicate the obvious clarity exception.

The Court notes that Plaintiff argues that it was clearly established on November 6, 2008 that the tasing that occurred in the instant case constituted excessive force.  In support of this argument, Plaintiff cites to <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1291 (11th Cir. 2011).  The Court, however, finds Plaintiff's reliance on <u>Fils</u> to be misplaced.

In <u>Fils</u>, one of the plaintiffs, Nemours Maurice, was leaving a club on August 23, 2003 while police were making arrests in the parking lot.  <u>See id.</u> at 1277.  Maurice stated to his friend, referring to the police officers, that "these motherfuckers are overreacting."  <u>See id.</u>  One of the officers, officer Bergert, who was behind Maurice, then said, "what you said [sic], motherfucker?"  <u>See id.</u>  Maurice turned around and saw Bergert with his taser drawn.  Maurice then raised his hands and took one step backward toward the club's entrance.  <u>See id.</u>  Bergert then fired his taser at Maurice.  <u>See id.</u>  Maurice did not fall to the ground after the first taser shot, and thereafter, another officer, officer Williams, shot Maurice with a taser.  <u>See id.</u>  Maurice was charged with resisting arrest without force and disorderly conduct.  <u>See id.</u> at 1288.

Maurice filed suit, alleging that the officers used excessive force by tasing him.  The appellate court concluded that the force used by the officers was excessive and that the law was clearly established, stating:

> Bergert and Williams should have known that their conduct violated Maurice's Fourth Amendment rights. Maurice was tased even though he committed at most a minor offense; he did not resist arrest; he did not threaten anyone; and he did not disobey any instructions (for

24

none were given).  These facts are sufficiently similar to the facts of Priester and Vinyard that these Defendants were on notice that their conduct violated Maurice's rights.  In Priester, the defendant-officer set his attack dog on the plaintiff even though the plaintiff had submitted to the defendant-officer's every command and was laying flat on the ground.  And, in Vinyard, the defendant-officer sprayed pepper spray into the eyes of a non-violent plaintiff, who was handcuffed safely in the back seat of the defendant-officer's police car, and had threatened no one.  These two cases clearly establish that such force is excessive where the suspect is non-violent and has not resisted arrest.  While these cases are not identical to Maurice's case, they need not be "materially similar"; the precedent need only provide the Defendants with "fair warning."  These cases do just that.

Even if these cases did not exist, the Defendants' conduct would fall under the narrow "obvious clarity" exception described above.  The facts as we must accept them show that Maurice showed no hostility to the Defendants, did not disobey any orders, and did not make any menacing gestures.  Assuming these facts, no reasonable officer could ever believe that it was appropriate to shoot his taser probes into Maurice and shock him.  This line is not hazy, and Bergert's and Williams's actions were clearly wrong.

Id. at 1292 (internal citations omitted).

Fils is distinguishable from the instant case, because Fils does not involve a suspect running away from police officers.  In the instant case, it is undisputed that at the time that Plaintiff was tased, he was running away from the officers.  As such, this Court rejects Plaintiff's argument that it was clearly established on November 6, 2008 that the tasing that occurred in the instant case constituted excessive force.

Accordingly, the Court concludes that the officers are entitled to qualified immunity with respect to Plaintiff's excessive force claim, because it was not clearly established on November 6, 2008 that the tasing that occurred in the instant case constituted excessive force.  Furthermore, the Court notes that the officers argue, and the Court agrees, that Barrett and Smith did not deploy the taser, encourage Cornelius to deploy his taser, nor were they involved in Cornelius'

decision to deploy his taser.  As such, that is an additional reason that Smith and Barrett are entitled to summary judgment on this claim.  See Harper v. Perkins, 459 Fed. Appx. 822, 827-28 (concluding that the officers that did not actually deploy the taser, but who were involved in the decision to tase the subject, could be sued for excessive force).  Therefore, the Court grants the officers summary judgment on this claim.

### 3.  Denial of Medical Treatment

Plaintiff asserts a claim against the officers for denial of medical treatment.  Specifically, he contends that he was deprived of his Fourth and Fourteenth Amendment rights by: (1) the officers representing to the paramedics at the scene that he was ok and did not need medical treatment, (2) the officers refusing to remove his handcuffs so the paramedics could adequately examine his injuries, and (3) delaying medical treatment by not driving him directly to the jail after he was arrested.

Before the Court can address the merits of this claim, the Court must first address Plaintiff's argument that this denial of medical treatment claim should be analyzed under the Fourth Amendment rather than the Fourteenth Amendment.  Another court addressed this precise issue and stated:

> The Eleventh Circuit has apparently never been squarely faced with the question of whether the Fourth, rather than the Fourteenth, Amendment might apply to allegations of denial of medical care by arresting police officers.  The Thomas case appears to be the controlling authority at this time, holding that the substantive due process clause of the Fourteenth Amendment requires the responsible government or governmental agency to provide medical care to persons who have been injured while being apprehended by the police.[19]  In light of the absence of Eleventh Circuit precedent

---

[19]In Thomas v. Town of Davie, 847 F.2d 771 (11th Cir. 1988), the plaintiff asserted a denial of medical care claim.  The officers approached the plaintiff after the plaintiff had been

distinguishing between alleged denial of medical care by police to an arrestee and alleged denial of medical care by pretrial detention officials, this Court should apply the Fourteenth Amendment "deliberate indifference" standard in this case, rather than the Fourth Amendment's objective reasonableness standard. The distinction is important because, under the Fourth Amendment standard, the Court need only to decide, upon a view of the evidence most favorable to the plaintiff, whether the asserted denial of medical treatment was objectively unreasonable. Under the Fourth Amendment, the denial of medical care to an arrestee is thus judged as but one component of the objective reasonableness standard for any "seizure" and is evaluated by reference to the totality of circumstances and the reasonable person standard. Under the Fourteenth Amendment due process standard, however, the issue is whether the plaintiff was deprived of life or liberty without due process of law. [Under the Fourteenth Amendment] [a] claim of denial of medical care requires a showing of acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs or the unnecessary and wanton infliction of pain.

Ponce De Leon v. Jackson Memorial Hosp., 2009 WL 3818429, at * 3-4 (S.D. Fla. Nov. 13, 2009)(citations omitted). This Court agrees with the reasoning of the court in Ponce De Leon and concludes that Plaintiff's denial of medical treatment claim should be analyzed under the Fourteenth Amendment. Therefore, to the extent that the denial of medical treatment claim is asserted under the Fourth Amendment, the Court grants the officers summary judgment. See Slone v. Judd, 2010 WL 2542283, at *6 (M.D. Fla. June 23, 2010)(granting motion to dismiss to the extent that the denial of medical treatment claim was asserted under the Fourth Amendment).

The officers argue that they are entitled to summary judgment on this claim, because Plaintiff cannot show that they were deliberately indifferent to his serious medical needs. The

---

involved in a car accident, and the plaintiff alleged that it was obvious that he was in need of immediate medical attention. See id. at 772. Instead of providing the plaintiff with medical care, the officers gave the plaintiff a roadside sobriety test and then transported him to jail (his blood alcohol level was 0.0%). See id. In analyzing the plaintiff's claim, the appellate court stated that the relevant constitutional provision was the due process clause of the Fourteenth Amendment and applied the deliberate indifference standard. See id. at 772-73.

Court agrees with the officers.

Courts have described the standard for analyzing this type of claim as follows:

> To prove deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury.
>
>     \*       \*       \*
>
> There are two ways to prove serious medical need. One is if delay in treating the condition worsens it, and the other is if the need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."
>
>     \*       \*       \*
>
> To meet the second element, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.

Nasseri v. City of Athens, 373 Fed. Appx. 15, 19-20 (11th Cir. 2010)(internal citations and footnote omitted).

With regard to the first element—serious medical need—the Court agrees with the officers that Plaintiff has not pointed to any record evidence that the delay in treating his injuries worsened his injuries. Therefore, in order to meet this element, Plaintiff must show that the injuries to his arm and wrist were so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

Plaintiff contends that his left arm was "obviously mangled" and that the officers picked him up off the ground from his right side. As such, Plaintiff contends that the injuries to his arm and wrist were so obvious that even a lay person would easily recognize the necessity for a doctor's attention and that the officers subjectively perceived such injuries.

The Court rejects this argument, because the paramedics were called to the scene and examined Plaintiff's arm, and Plaintiff specifically told the paramedics that his arm was hurt.

However, the paramedics, who have some medical training, did not insist that Plaintiff be taken to the hospital.  In fact, the only injuries noted by the paramedics on their incident report were "an abrasion on his right cheek and wrist" and that he had been tased and had a taser rod removed from his back.  (Doc. No. 56-1).

Plaintiff responds to this evidence with two arguments: (1) according to the paramedics' incident report, the paramedics asked, but were not allowed, to have Plaintiff's handcuffs removed while examining his injuries, and (2) the incident report indicates that the disposition of the incident was "Non-Transport Cancel (By Law Enforcement)."  (Doc. No. 56-1).  Thus, Plaintiff contends that the officers interfered with the paramedics' attempt to treat Plaintiff and essentially forced the paramedics to leave.

Plaintiff, however, did not provide the deposition testimony of any of the paramedics to corroborate his arguments.  As such, there is no evidence in the record regarding who denied the paramedics' request to remove Plaintiff's handcuffs,[20] and the evidence is undisputed that there were other officers on the scene in addition to Defendant officers.  Thus, there is no evidence that Defendant officers denied the paramedics' request to remove Plaintiff's handcuffs.  Furthermore, there is no evidence in the record, such as testimony from a paramedic, that the refusal to remove Plaintiff's handcuffs inhibited the paramedics' examination of Plaintiff's injuries.

Likewise, the statement in the incident report that the disposition was "Non-Transport Cancel (By Law Enforcement)" does not necessarily mean that Defendant officers told the paramedics to leave.  The only way to know what this statement actually means is to have some

---

[20]Plaintiff does not identify in his deposition testimony who denied the paramedics' request to remove his handcuffs.

testimony from a paramedic to explain it; however, there is no such testimony in the record. Neither the Court, nor a jury, should speculate regarding what this statement means.

Thus, the evidence before the Court is that the paramedics, who are trained medical professionals, came to the scene and examined Plaintiff's injuries, and thereafter, the paramedics left without taking Plaintiff to the hospital.  There is no evidence that any of Defendant officers forced the paramedics to disregard their medical duties and leave the scene, and the Court will not make such an assumption based solely on the evidence that Smith told the paramedics that Plaintiff was ok.

Given that the paramedics that examined Plaintiff did not indicate that Plaintiff needed to be taken to the hospital, the Court concludes that the officers were not deliberately indifferent to Plaintiff's medical needs, and they cannot be liable for failing to second-guess the paramedics' medical judgment.  This is true even after the paramedics left and Plaintiff complained of pain during the drive to the jail.

While it is undisputed that the injuries to Plaintiff's arm and wrist were obvious once he arrived at the jail and his handcuffs were removed, he was immediately taken to the hospital at that time.  Plaintiff does not provide any evidence, such as deposition testimony from the nurse at the jail, that Plaintiff's injuries should have been obvious to the officers at the time of Plaintiff's arrest and/or that the removal of Plaintiff's handcuffs for the paramedics would have revealed the severity of his injuries; the Court will not simply assume such evidence exists. Accordingly, the Court concludes that Plaintiff has failed to present evidence that he had a serious medical need that was so obvious that even a lay person would easily recognize the necessity for a doctor's attention and that the officers subjectively perceived that risk.  Therefore,

the Court grants the officers' motion for summary judgment on this claim.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Defendants Barrett, Cornelius, and Smith's Motion for Summary Judgment (Doc.

No. 56) is **GRANTED IN PART AND DENIED IN PART**: The motion is

denied to the extent that Plaintiff's unlawful seizure claim is based on Plaintiff's

seizure after he fled from the officers; otherwise, the motion is granted.

(2)     Plaintiff's Motion for Summary Judgment (Doc. No. 57) is **DENIED**.

(3)     This case is set for a pretrial conference on February 4, 2014 at 8:30 a.m., and the

parties' joint pretrial statement must be filed by ***January 30, 2014***.

**DONE AND ORDERED** at Tampa, Florida, this 23rd day of January, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record

31