UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDDY LEON GRADDY,

        Plaintiff,

v.                                                 Case No.  8:12-cv-1882-T-24 EAJ

CITY OF TAMPA, ET AL.,

        Defendants.

_____/

## ORDER

This cause comes before the Court on the City of Tampa's Motion for Summary

Judgment.  (Doc. No. 43).  Plaintiff opposes the motion.[1]  (Doc. No. 61).  As explained below,

the motion is granted in part and denied in part.

## I.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The Court must draw all inferences from the evidence in the light most favorable to the

non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d

1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of

showing the Court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial.  See id. (citation omitted).  When a moving party has

discharged its burden, the non-moving party must then go beyond the pleadings, and by its own

---

[1]The Court reminds Plaintiff that Local Rule 3.01(b) provides a page limit of twenty pages for responses, and Local Rule 1.05(a) requires twelve-point font.  Plaintiff must adhere to these rules when filing documents in the future, or the Court may strike his filings.

affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background[2]

This case involves Plaintiff Eddy Leon Graddy's claims of unlawful seizure, excessive

force, and denial of medical treatment against Defendant police officers and corresponding

claims for unlawful seizure, excessive force, assault and battery, and negligence against

Defendant City of Tampa ("City").  The incident at issue occurred on November 6, 2008, when

Plaintiff was at a domino hall called B&C Sundays, located at 1806 North Nebraska Avenue.

While there, people said that a police officer that they referred to as "Batman" was outside.

(Doc. No. 49, p. 33).  Plaintiff went outside onto the sidewalk and saw Barrett (who the people

referred to as Batman) across the street on his bike.  (Doc. No. 49, p. 33-34).  Thereafter,

Plaintiff saw Smith and Cornelius drive by slowly a few times in their police car.  (Doc. No. 49,

p. 33-36).

Around 4:48 p.m., during their final drive by, Smith and Cornelius stopped their car, and

Smith opened the passenger door and asked for Plaintiff's identification.  (Doc. No. 49, p. 35, 37,

37).  Plaintiff complied and gave Smith his identification.  (Doc. No. 49, p. 36-37).  During this

exchange, Smith was in the passenger seat with one leg out of the door, Cornelius was in the

driver's seat, and Barrett was still across the street.  (Doc. No. 49, p. 37).

Smith took Plaintiff's identification and ran it through the computer in the police car.[3]

---

[2]All references to page numbers from a deposition refer to the deposition page number,
not the docket page number.

[3]The Officer/Unit Activity Search report indicates that this was done at 4:48 p.m.  (Doc.
No. 60-3, p. 7).

2

(Doc. No. 49, p. 37).  Smith then asked if he could search Plaintiff.  (Doc. No. 49, p. 39).  By this time, Barrett had crossed the street and was standing behind and off to the side of Plaintiff. (Doc. No. 49, p. 39-40).  Plaintiff responded that he did not want to be searched, because he did not have anything on him and his kids would be coming by and he did not want his kids to see him being searched.  (Doc. No. 49, p. 40).  In response, Barrett said, "We're going to search you your way or our way."  (Doc. No. 49, p. 40-41).  Plaintiff perceived Barrett's statement as suggesting that a search done their way would be "physical" and that he would be "roughed up." (Doc. No. 49, p. 41).

At this time, Cornelius got out of the car and went around the back of the car towards Plaintiff.  (Doc. No. 49, p. 41-43).  Plaintiff describes the scene as Smith inside the passenger side of the car with his leg outside the car and Barrett and Cornelius getting closer and "closing in."  (Doc. No. 49, p. 41-44).  Next, Plaintiff saw Barrett reach for his belt, and Plaintiff thought that Barrett was reaching for his gun, so Plaintiff ran away from the officers.  (Doc. No. 49, p. 44-45).  The next thing that Plaintiff remembers is waking up on the ground (because he later learned that Cornelius had deployed his taser on Plaintiff's back after Plaintiff ran away).  (Doc. No. 49, p. 48).

As Plaintiff woke, he saw the three officers standing over him.  (Doc. No. 49, p. 49).  The officers walked Plaintiff back to the police car, and Smith put handcuffs on Plaintiff behind his back.  (Doc. No. 49, p. 51, 71).  Plaintiff was arrested and charged with: (1) possession of a controlled substance, (2) possession of a controlled substance with intent to deliver, (3) tampering with evidence, (4) obstructing or opposing without violence, and (5) possession of a controlled substance within 1,000 feet of a church.  Plaintiff denies that he had any drugs on him

at any time.  (Doc. No. 49, p. 51).  The arrest occurred at 4:52 p.m.  (Doc. No. 44, p. 102-03; Doc. No. 60-3, p. 7).

Plaintiff contends that as a result of the fall, his left arm was obviously mangled, which would have been apparent to anyone who saw it.  (Doc. No. 60-1, ¶ 7-8).  He further contends that when the officers helped him up from the ground, they intentionally picked him up from his right side.  (Doc. No. 60-1, ¶ 6).

After Plaintiff was put in the back of the police car, he started complaining to Cornelius about his arm hurting.  (Doc. No. 49, p. 53-54).  This is the first time during this incident that Plaintiff complained about his arm hurting.  (Doc. No. 49, p. 54).

At some point, Tampa Fire Rescue arrived on the scene (because they are called whenever a taser is discharged), and a female paramedic asked Plaintiff (while he was in the back of the police car) if he needed to go to the hospital.  (Doc. No, 49, p. 55-56; Doc. No. 44, p. 100).  Plaintiff responded that his arm was broken, that he could hear his bones crackling, and that his arm was hurting.  (Doc. No. 49, p. 55).  Before the paramedic could respond, Smith stated, "He's a tough guy.  He's all right.  There ain't nothing wrong with him.  He's a bad egg." (Doc. No. 49, p. 55).

At some point, Plaintiff was let out of the police car so that the paramedic could look at his arm.  (Doc. No. 49, p. 56).  Plaintiff kept saying to look at his left arm.  (Doc. No. 49, p. 56).  Plaintiff heard Smith say "enough of that" and "he's all right."  (Doc. No. 49, p. 58, 60; Doc. No. 48, p. 7).  The paramedics asked that Plaintiff's handcuffs be removed, but their request was

denied.[4]  (Doc. No. 56-1, p. 3).  Plaintiff was put back in the police car, and Tampa Fire Rescue left the scene.  (Doc. No. 49, p. 59).

Cornelius and Smith transported Plaintiff from the scene, but they did not drive directly to the jail.  Instead, they first stopped at a club called the Blue Note.  (Doc. No. 49, p. 67). Thereafter, they made a stop at GameWorks for about thirty minutes.  (Doc. No. 49, p. 68). After stopping at GameWorks, Cornelius and Smith took Plaintiff to the jail.  (Doc. No. 49, p. 69).  During the ride, Plaintiff was crying in pain.  (Doc. No. 49, p. 70).  Plaintiff asked the officers to loosen the handcuffs because he was in extreme paid, but they ignored his request. (Doc. No. 60-1, ¶ 9-10).

According to the Officer/Unit Activity Search report, Plaintiff arrived at the jail at 5:41 p.m., 49 minutes after he was arrested.  (Doc. No. 60-3, p. 7).  However, according to Smith, the drive from 1806 North Nebraska Avenue directly to the jail should take about ten minutes. (Doc. No. 47, p. 152).

At the jail, Plaintiff was seen by a nurse.  (Doc. No. 49, p. 71).  While with the nurse, Plaintiff saw that his face was all scraped up.  (Doc. No. 49, p. 71-73; Doc. No. 48, p. 24).  The nurse told somebody to take the handcuffs off of Plaintiff, and once the handcuffs were removed, Plaintiff's arm was shaped like a snake and just dropped.  (Doc. No. 49, p. 71-72).  Even Cornelius acknowledged during his deposition that when the handcuffs were removed, it was obvious that something was wrong with Plaintiff's arm.  (Doc. No. 46, p. 254).  The nurse began yelling at the officers and asking why Plaintiff was brought to the jail in this condition.  (Doc.

---

[4]The record is unclear regarding who denied the request that Plaintiff's handcuffs be removed.  (Doc. No. 56-1, p. 3).

No. 49, p. 72).  The nurse attempted to temporarily fix Plaintiff's arm and told the officers to take Plaintiff to the hospital and not to handcuff him.  (Doc. No. 49, p. p. 72).  Smith and Cornelius rushed Plaintiff to the hospital.  (Doc. No. 49, p. 73-74).  The hospital determined that Plaintiff had a Galeazzi fracture of his left forearm and that surgery was required.  (Doc. No. 56-2; Doc. No. 56-3).

In his amended complaint, Plaintiff asserts seven claims against the officers (in their individual capacities) and the City.  (Doc. No. 19).  Specifically, Plaintiff asserts the following claims: (1) a § 1983 unlawful seizure claim against the City, (2)  a § 1983 unlawful seizure claim against the officers, (3)  a § 1983 excessive force claim against the officers, (4) a § 1983 excessive force claim against the City, (5) a denial of medical treatment claim against the officers, (6) a claim of assault and battery against the City, and (7) a negligence claim against the City.

Plaintiff and the officers filed cross-motions for summary judgment.  The Court denied Plaintiff's motion, and the Court granted in part and denied in part the officers' motion.  Specifically, the Court concluded that: (1) when the officers first approached Plaintiff and asked his name, for his identification, and why he was outside, such was a consensual encounter; (2) the initial encounter did not turn into a detention (prior to Plaintiff running away), because Plaintiff did not submit to the officers' show of authority; (3) there was no seizure until Plaintiff was tased, and there is a genuine issue of material fact regarding whether there was probable cause for the seizure and whether the seizure was lawful; (4) Plaintiff's excessive force claim against the officers failed, because it was not clearly established on November 6, 2008 that tasing Plaintiff under the circumstances in this case would violate his constitutional rights; and

(5) Plaintiff's denial of medical treatment claim against the officers failed because Plaintiff cannot show that they were deliberately indifferent to his serious medical needs.

### III.  City's Motion for Summary Judgment

The City moves for summary judgment on the four claims asserted against it: (1) § 1983 unlawful seizure, (2) § 1983 excessive force, (3) assault and battery, and (4) negligence. Accordingly, the Court will analyze the City's motion with respect to each claim.

#### A.  Unlawful Seizure and Excessive Force

Plaintiff asserts an unlawful seizure claim and an alternative excessive force claim (if the seizure is deemed lawful) against the City.  Both claims are based on Plaintiff's contention that the use of a taser on him constituted unreasonable force, either because the seizure itself was unlawful or because the amount of force used under the circumstances was excessive.  Plaintiff seeks to hold the City liable on the theories of inadequate supervision and training.  Specifically, Plaintiff contends that: (1) the City allowed a pattern and practice of unreasonable force to be used by maintaining a system of review of police conduct that is so cursory as to be ineffective and that tolerates unreasonable force; and (2) the City inadequately trains its officers regarding reasonable force.

The Eleventh Circuit has stated the following regarding a municipality's liability:

> [T]o impose § 1983 liability on a municipality, a plaintiff must show:
> (1) that his constitutional rights were violated; (2) that the
> municipality had a custom or policy that constituted deliberate
> indifference to that constitutional right; and (3) that the policy or
> custom caused the violation. . . .  A plaintiff seeking to hold a
> municipality liable under § 1983 must "identify a municipal 'policy'
> or 'custom' that caused the plaintiff's injury."  We defined custom as
> "a practice that is so settled and permanent that it takes on the force
> of the law."  In order for a plaintiff to demonstrate a policy or
> custom, it is "generally necessary to show a persistent and wide-

7

spread practice."  This threshold identification of a custom or policy "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  This prevents the imposition of liability based upon an isolated incident.   Rather, the incident must result from a demonstrated practice.

&ast;  &ast;  &ast;

[W]here the plaintiff claims that a municipality's facially valid actions violated his constitutional rights[,] . . . "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." . . . To meet this burden, a plaintiff must demonstrate that the lawful action was "taken with 'deliberate indifference' as to its known or obvious consequences."  Plainly stated, a "showing of simple or even heightened negligence is not enough."

&ast;  &ast;  &ast;

Our final inquiry examines causation.  A plaintiff must prove causation by demonstrating that the municipality's "*deliberate* conduct . . . was the 'moving force' behind [his] injury. . . ." . . . "To prevent municipal liability for a . . . decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."

<u>McDowell v. Brown</u>, 392 F.3d 1283, 1289-92 (11th Cir. 2004)(internal citations omitted).

With regard to the deliberate indifference standard for claims of failure to train, the

Supreme Court has stated:

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution."  A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ."

8

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train.  Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability."  Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011)(internal citations omitted).  The same

standard applies to claims of failure to supervise.  See Gold v. City of Miami, 151 F.3d 1346,

1350-51 (11th Cir. 1998)(citations omitted).

With these standards in mind, the Court analyzes the City's motion for summary

judgment with respect to Plaintiff's § 1983 claims against the City.  As previously stated,

Plaintiff must show: (1) that his Fourth Amendment right to be free from excessive force was

violated; (2) that the City had a custom or policy that constituted deliberate indifference to that

constitutional right; and (3) that the policy or custom caused the violation.  Because Plaintiff

cannot show that a genuine issue of material fact exists with regards to the second element, the

City is entitled to summary judgment on Plaintiff's § 1983 claims.[5]

The Tampa Police Department ("TPD") had a policy in place regarding the use of tasers

on the date of the incident.  (Doc. No. 43-25).  The policy provided, among other things, that: (1)

only officers that have completed a user certification course could carry and use a taser; (2) the

tasers are issued to officers in order "to neutralize combative, non-compliant, and/or violent

---

[5]There are genuine issues of material fact regarding the events that occurred prior to the tasing, so the Court will not decide whether a Fourth Amendment violation occurred.  However, for the purpose of analyzing the § 1983 claims against the City, the Court will assume that there was a Fourth Amendment violation.

subjects;" (3) officers "shall use only that degree of force necessary to bring a subject and/or situation under control;" and (4) an officer's "decision to deploy the [taser] **shall** involve an arrest or custodial situation wherein the subject is impeding the officer's attempts to gain or maintain physical control."  (Doc. No. 43-25)(emphasis added).  Additionally, the City points out that Defendant Officers Barrett, Smith, and Cornelius each completed the user certification course and received additional taser training in 2006, 2007, and 2008.  (Doc. No. 43-28, Doc. No. 43-29, Doc. No. 43-30).

The TPD also had requirements regarding reporting use of force.  Specifically, Manual of Regulations 1603 requires that officers report each instance of use of force, including pointing or deploying a taser, by submitting a written report containing detailed information relating to the type and degree of force used.  (Doc. No. 43-11).

Additionally, the TPD had an Early Intervention Program ("EIP") in place in order to identify officers that engaged in a pattern or practice of potentially problematic behavior.  (Doc. No. 43-8).  One type of behavior that the EIP tracked was when an officer was involved in four or more use of force incidents (in which a certain specified minimum level of force was used against a suspect) within a 90-day period.  (Doc. No. 43-8).  When such conduct occurs, the officer and his or her supervisor have a personal meeting to discuss the force used during the incidents, and then the supervisor recommends a disposition.  (Doc. No. 43-8).

Despite the official policy regarding use of tasers, the taser training given, and the EIP, Plaintiff contends that: (1) the City allowed a pattern and practice of unreasonable force to be used by maintaining a system of review of police conduct that is so cursory as to be ineffective and that tolerates unreasonable force; and (2) the City inadequately trains its officers regarding

10

reasonable force.  In support of these contentions, Plaintiff primarily relies on three things—(1) the discussions in the TPD's High Liability Committee ("HLC") meetings, (2) a 2006 incident of tasing that was reviewed by the Internal Affairs Bureau ("IAB"), and (3) prior incidents of Cornelius' alleged inappropriate taser usage—to show that the City had notice of, and was deliberately indifferent to, the problem of officers' excessive force with regard to taser usage.[6]

<u>The HLC</u>

The HLC discusses issues that can lead to high liability, such as excessive force, and makes recommendations for policies and training.  (Doc. No. 54, p. 7-8).  On January 20, 2006, the HLC discussed the fact that taser usage was not being adequately reported and that supervisors should add comments on the use of force form.  (Doc. No. 43-14).  On March 10, 2006, the HLC discussed the type of administrative review of taser usage that should occur—that a supervisor should go to the scene, that a report should be created, and that a use of force form should be completed.  (Doc. No. 43-15).

<u>The 2006 Incident Reviewed by the IAB</u>

Additionally, Plaintiff points to a 2006 incident of tasing that was reviewed by the IAB. On February 20, 2006, an incident was reported to the TPD that an officer arrested a suspect,

---

[6]Many of the HLC discussions that Plaintiff points to occurred after November 6, 2008—the day Plaintiff was tased.  Such discussions cannot provide proof of the requisite notice to the City about problems with taser training and supervision, because such events occurred after November 6, 2008.  <u>See</u> <u>Connick</u>, 131 S. Ct. at 1360 n.7 (stating that subsequent conduct cannot establish a pattern of violations that would provide notice to the city); <u>Thompson v. Sheriff, Pinellas County, FL</u>, 2013 WL 5663281, at *2 (11th Cir. Oct. 18, 2013)(stating that complaints that occurred after the incident could not have put the sheriff on notice of a need for supervision as of the date of the incident).  As such, the Court will not set forth the content of the HLC discussions that occurred after November 6, 2008.  Likewise, the Court omits Michael Rivera's deposition testimony regarding issues discussed at the HLC, because he joined the HLC in 2009.  (Doc. No. 55, p. 5-6).

handcuffed him, and put the suspect in the back of a police car.  (Doc. No. 62-10; Doc. No.62-3).

While in the car, the suspect kept banging his head on the door and caused the door/window

frame to bulge.  (Doc. No. 62-3).  The officer stopped the car and forcibly removed the suspect

from the back seat and put him on the ground.  (Doc. No. 62-3).  The suspect was verbally

combative, began to spit, and was grinding his face on the pavement.  (Doc. No. 62-3).  The

officer threatened to use his taser on the subject and then did so for two seconds.  (Doc. No. 62-

3).  After a second threat to use the taser, the suspect was put in leg shackles and placed back

into the police car.  (Doc. No. 62-3).  While one reviewer stated that the suspect appeared to be

"physically compliant" at the time of the tasing, the TPD and the IAB concluded that the two-

second use of the taser was "technically within policy" because it was done to keep the suspect

from continuing to injure his face and to make the suspect stop spitting.  (Doc. No. 62-10; Doc.

No. 62-3).  As a result, the complaint regarding the taser usage was determined to be unfounded

and the officer was exonerated.  (Doc. No. 62-10; Doc. No. 62-3).  However, the IAB noted that

the tasing was "not an ideal option under the circumstances and w[ould] be addressed as a lessor

or non-viable option under training in this case."  (Doc. No. 62-3).

<u>Prior Alleged Inappropriate Taser Usage By Cornelius</u>

Finally, Plaintiff points to four specific incidents over a three year period that Cornelius

was involved in and that were flagged by the EIP.  First, on March 6, 2005, Cornelius stopped a

man on a bicycle because the bicycle did not have a headlight.  (Doc. No. 62-6).  As Cornelius

sat in his police car and filled out a citation, the man ran away.  (Doc. No. 62-6).  Cornelius

ordered the man to stop, but the man continued to flee and climbed a fence.  (Doc. No. 62-6).

Cornelius deployed his taser, but the taser did not make contact with the man, and the man ran

away.  (Doc. No. 62-6).  This incident was reviewed on August 13, 2005 as part of the EIP, and

no further action was taken against Cornelius.  (Doc. No. 43-10).

Second, on October 7, 2005, Cornelius had a consensual encounter with a man and asked

the man's name.  (Doc. No. 62-7).  The man gave Cornelius a false name, and when Cornelius

found the man's wallet on the ground with his real name, the man ran away.[7]  (Doc. No. 62-7).

In response, Cornelius tased the man and took him into custody.  (Doc. No. 62-7).  After the

tasing, when Cornelius entered the man's real name into the computer database, Cornelius

learned that the man had numerous active warrants.  (Doc. No. 62-7).  This incident was

reviewed on December 11, 2005 as part of the EIP, and no further action was taken against

Cornelius.  (Doc. No. 43-10).

Third, on January 31, 2008, Cornelius observed a man loitering outside a bar.  (Doc. No.

62-8).  Cornelius told the man that he need to speak with him and asked for his identification.

(Doc. No. 62-8).  The man responded that he did not have identification and walked away.  (Doc.

No. 62-8).  Cornelius told the man to stop walking, and Cornelius saw the man discard a small

object that had a reflective property, which Cornelius thought was consistent with narcotics

packaging.  (Doc. No. 62-8).  The man ran away, and Cornelius ordered him to stop and warned

that Cornelius would tase him.  (Doc. No. 62-8).  The man continued to flee, so Cornelius

deployed his taser.  (Doc. No. 62-8).  The man was subsequently arrested.  (Doc. No. 62-8).

Cornelius found the discarded object, which field-tested positive for cocaine.  (Doc. No. 62-8).

This incident was reviewed on April 28, 2008 as part of the EIP, and no further action was taken

---

[7]Plaintiff contends that it is not illegal to give a police officer a false name during a
consensual encounter.  See Cooks v. State, 901 So. 2d 963, 964 (Fla. 2d DCA 2005)(citing
Belsky v. State, 831 So. 2d 803, 805 (Fla. 4th DCA 2002)).

against Cornelius.  (Doc. No. 43-10).  However, after the incident was reviewed, on June 12

2008, the FDLE lab determined that the discarded object did not test positive for cocaine.  (Doc.

No. 62-8).

Fourth, on March 25, 2008, Cornelius was at the scene of a traffic accident, and a man

kept walking into the roadway and was obstructing traffic.  (Doc. No. 62-9).  Cornelius issued

the man a citation for walking into the roadway.  (Doc. No. 62-9).  Thereafter, the man walked

away and shouted an obscenity at Cornelius, and in response, Cornelius ordered the man to stop

and come back.  (Doc. No. 62-9).  The man started running away, and Cornelius chased him and

ordered him to stop.  (Doc. No. 62-9).  The man fell on the ground and Cornelius and another

officer tried to handcuff the man, but the man would not show his hands, tried to get up, and did

not comply with commands.  (Doc. No. 62-9).  Cornelius then tased the man and subsequently

handcuffed him.  (Doc. No. 62-9).  This incident was reviewed on April 28, 2008 as part of the

EIP, and no further action was taken against Cornelius.  (Doc. No. 43-10).

<u>Analysis of Plaintiff's Proffered Evidence</u>

Based on the above evidence, Plaintiff contends that he has shown that the City had

notice of, and was deliberately indifferent to, the problem of officers' excessive force with

regard to taser usage.  However, as explained below, the Court concludes that Plaintiff has not

shown a persistent and wide-spread practice of inappropriate taser usage that would put the City

on notice of a need for additional taser training and/or that its review of taser usage was

inadequate.

To begin with, the discussion by the HLC—that taser usage was not being adequately

reported, that supervisors should add comments on the use of force form, and describing the type

14

of administrative review of taser usage that should occur—does not indicate that tasers were being used in a manner that constituted excessive force.  As such, the discussions of the HLC that occurred prior to November 6, 2008 do not put the City on notice of the need for taser training and/or that its review of taser usage was inadequate.

Next, the 2006 incident that was reviewed by the IAB contradicts Plaintiff's position that the City engages in inadequate review, and instead, the incident shows that review of taser usage was occurring.  See Thompson v. Sheriff, Pinellas County, FL, 2013 WL 5663281, at *2 (11th Cir. Oct. 18, 2013)(concluding that the investigation that occurred was adequate and that a perfect investigation is not necessary).  While Plaintiff may disagree with the IAB's conclusion exonerating the officer regarding his use of the taser, the evidence related to this incident shows that the IAB investigated the claim and did not merely rubber-stamp the use of force.  (Doc. No. 62-3).  For example, the IAB also reviewed the overall force used on the suspect and sustained the violation of excessive force and reprimanded the officer.  (Doc. No. 62-3).

Finally, the four incidents of prior taser usage by Cornelius, while not ideal, are not sufficient to put the City on notice of a need for additional taser training and/or that its review of taser usage was inadequate.  See Ott v. City of Mobile, 169 F. Supp.2d 1301, 1311 (S.D. Ala. 2001)(concluding that four excessive force complaints within five years prior to the incident at issue were not sufficient to show a custom or policy of deliberate indifference and were not sufficient to show that the city's training program was inadequate); Hawk v. Klaetsch, 522 Fed. Appx. 733, 736 (11th Cir. 2013)(concluding that three excessive force complaints within five years were not sufficient to show a widespread practice of excessive force); Blanchard v. City of

Birmingham, 2013 WL 169285, at *3 (N.D. Ala. Jan. 15, 2013)[8](concluding that three incidents

of excessive force, including two against the officer at issue, did not provide notice of a need to

train and supervise officers regarding excessive force).  Instead, this Court notes that the fact that

a particular officer is not adequately trained is not, in itself, sufficient to hold the City liable, as

"the officer's shortcomings may have resulted from factors other than a faulty training program."

City of Canton, Ohio v. Harris, 489 U.S. 378, 390-91 (1989)(citations omitted).  As explained by

the Supreme Court:

> It may be, for example, that an otherwise sound program has
> occasionally been negligently administered.  Neither will it suffice to
> prove that an injury or accident could have been avoided if an officer
> had had better or more training, sufficient to equip him to avoid the
> particular injury-causing conduct.  Such a claim could be made about
> almost any encounter resulting in injury, yet not condemn the
> adequacy of the program to enable officers to respond properly to the
> usual and recurring situations with which they must deal.  And
> plainly, adequately trained officers occasionally make mistakes; the
> fact that they do says little about the training program or the legal
> basis for holding the city liable.

Id. at 391.  Thus, Plaintiff "must show that the training program itself [wa]s deficient, and not

just that a particular officer was inadequately trained." Owens v. City of Fort Lauderdale, 174 F.

Supp.2d 1282, 1294 (S.D. Fla. 2001); see also Board of County Commissioners of Bryan

County, Oklahoma v. Brown, 520 U.S. 397, 407 (1997)(stating that the deficient training

program referred to in Canton was "intended to apply over time to multiple employees").  The

Court concludes that these four incidents by Cornelius do not show that the taser training

program was inadequate.

---

[8]Additional facts for this case can be found in the court's prior opinion.  See Blanchard v.
City of Birmingham, 2012 WL 5426228 (N.D. Ala. Nov. 2, 2012).

To the extent that Plaintiff relies on these four incidents by Cornelius to show that the City's supervision of taser usage was inadequate, the Court again finds that four incidents over a three year period are not indicative of a widespread pattern or practice of inadequate supervision. These four incidents, plus the 2006 taser incident by another officer that was reviewed by the IAB, are the only incidents that Plaintiff points to that occurred prior to November 6, 2008 that did not result in an adverse action against the officer in response to the taser usage.

Accordingly, viewing Plaintiff's evidence collectively and in the light most favorable to Plaintiff, Plaintiff has not shown a widespread pattern or practice of excessive force from taser usage. Therefore, Plaintiff has not shown that the City was put on notice, as of November 6, 2008, of the need for taser training and/or that its review of taser usage was inadequate. As such, Plaintiff cannot show that the City had a custom or policy that constituted deliberate indifference to his constitutional rights.

The Court notes that Plaintiff makes three other arguments to support his contention that the City was on notice of a need for additional taser training and/or that its review of taser usage was inadequate. However, as explained below, these arguments have no merit, because Plaintiff relies on evidence that is vague or is taken out of context.

First, Plaintiff cites to the deposition testimony of Eric Diaz, who participated in the HLC and represented the area of defensive tactics. (Doc. No. 54, p. 9). Plaintiff's reliance of Diaz's testimony is of little help, because his testimony is vague. While Diaz did state that the HLC discussed problems with taser usage, Diaz stated that this consisted of both using a taser when no force was appropriate and using a taser when a firearm should have been used. (Doc. No. 54, p. 16, 19-20). Diaz does not provide any detail regarding how often the HLC discussed the

17

problem of an officer using a taser when no force was appropriate, the circumstances of any

specific situations encountered by officers, or the specific content of the discussions; he simply

states that he recalls general discussions about the issue prior to 2008.  (Doc. No. 54, p. 33-34).

Finally, when Plaintiff asked Diaz if he ever had to tell an officer that they should have let

someone flee a voluntary stop instead of tasing them, Diaz responded, "I'm sure that I have."

(Doc. No. 54, p 28).  While Plaintiff implies that Diaz's testimony shows a widespread pattern or

practice of excessive force from taser usage, the Court finds Diaz's testimony to shed very little

light on the issue.  The Court expects that there will be discussions regarding the proper use of

tasers during HLC meetings, even if improper use is not a widespread problem at the time.

  Second, Plaintiff points to the deposition testimony of Michael Rivera.[9]  Plaintiff asked

Rivera if there had been instances when a supervisor signed off on an officer's use of force that

was later determined to be not justified, and Rivera responded that yes, it happens.  (Doc. No.

55, p. 80).  Plaintiff, however, is using that statement to imply that supervisors simply rubber-

stamp their approval for an officer's use of force, but without any of the underlying facts, the

Court is not willing to make such an assumption.

  Additionally, Plaintiff takes another statement by Rivera—that officers have threatened

the use of a taser when it was not justified—out of context.  Plaintiff asked Rivera whether

officers ever threatened the use of force in situations where the threat of force was not justified,

and Rivera responded:

   Well, it happens from time to time.  With the taser, though, not a lot.

---

[9]To the extent that Plaintiff cites to Rivera's testimony regarding HLC discussions that
occurred after November 6, 2008, the Court does not include such testimony, as it cannot show
the City's knowledge of a need to train or supervise prior to the incident at issue.

> You know, we have 952 officers, and you're going over a span of
> 2003 to present.  To say it's never happened, I mean, obviously, it's
> happened.  It's happened with the taser. . . . But it's so minimal that
> we usually, you know – that person is corrected, whether they get a
> pending file, a letter of counseling, and then they get remedial
> training.  It's not an epidemic, is what I'm saying.

(Doc. No. 55, p. 29).  Thus, Rivera's deposition testimony does not show a widespread pattern or

practice of excessive force from taser usage.

Third, Plaintiff points out that the City did not amend the taser policy to forbid the use of

a taser on a suspect fleeing from a voluntary encounter until June of 2011.  (Doc. No. 43-27).

Plaintiff's reliance on the 2011 amendment is misplaced, because the prior versions of the taser

policy did not permit using a taser on a suspect fleeing from a voluntary encounter; the 2011

amendment simply clarified the taser policy and gave the specific example that using a taser on a

suspect fleeing from a voluntary encounter is prohibited.

The Court notes that Plaintiff cites to the following portion of the 2006 taser policy to

support his contention that the prior version of the taser policy permitted using a taser on a

suspect fleeing from a voluntary encounter: an officer's decision to use a taser may be predicated

on the officer's belief that "escalation of resistance from passive physical resistance to active

physical resistance is imminent."  (Doc. No. 43-25).  The flaw in Plaintiff's argument is that he

takes that statement out of context; instead, the prior sentence in the taser policy states that an

officer's "decision to deploy the [taser] **shall** involve an arrest or custodial situation wherein the

subject is impeding the officer's attempts to gain or maintain physical control."  (Doc. No. 43-

25)(emphasis added).  Thus, the prior taser policy did not permit using a taser on a suspect

fleeing from a voluntary encounter.

Finally, even if the 2011 amendment signified the City's knowledge of a problem,

19

Plaintiff states in his response brief that the City recognized it to be a problem *in 2010*.  (Doc. No. 61, p. 8).  Such knowledge after the incident at issue cannot be used to hold the City liable for its actions in 2008.

Accordingly, based on all of the evidence and arguments set forth by Plaintiff, the Court concludes that Plaintiff has not shown a widespread pattern or practice of excessive force from taser usage.  Therefore, Plaintiff has not shown that the City was put on notice, as of November 6, 2008, of the need for taser training and/or that its review of taser usage was inadequate.  As such, Plaintiff cannot show that the City had a custom or policy that constituted deliberate indifference to his constitutional rights.  Without such a showing, the City is entitled to summary judgment on Plaintiff's § 1983 claims.

## B.  Assault and Battery

Plaintiff asserts a claim against the City titled, "Assault and Battery."  (Doc. No. 19). The City argues that it is entitled to summary judgment on the battery claim.[10]  With regard to a battery claim:

> Florida law provides that "a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is *clearly excessive* . . . . A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances."

---

[10]It is unclear whether Plaintiff is really attempting to assert a separate assault claim, because the allegations in his complaint refer mostly to an alleged battery; there is only a passing reference to "verbal abuse."  (Doc. No. 19).  Furthermore, the Court notes that there were no allegations in Plaintiff's version of the facts regarding verbal abuse.  Finally, the Court notes that "an essential element of the tort of assault is the apprehension of immediate harmful or offensive contact," Wynn v. City of Lakeland, 727 F. Supp.2d 1309, 1315 (M.D. Fla. 2010), yet it is unclear how Plaintiff could have had an apprehension of contact because he was tased while running away and did not know that Cornelius had drawn his taser.  However, the City has not specifically addressed the assault claim, and the Court will not address it further.

Sullivan v. City of Pembroke Pines, 161 Fed. Appx. 906, 911 (11th Cir. 2006)(quoting City of

Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)).  Furthermore, Florida law provides

that "when an officer has reasonable grounds to believe one has committed a felony, the officer

is entitled to use force which is reasonably necessary to capture him."  City of St. Petersburg v.

Reed, 330 So. 2d 256, 257 (Fla. 2d DCA 1976); Fla. Stat. § 776.05(3).

        In this case, the facts are disputed, and genuine issues of material fact exist regarding

whether there was probable cause for the arrest and whether the arrest was lawful.  Given the

disputed versions of the events, whether the force used on Plaintiff was reasonable (and thus,

whether a battery occurred) is also a question of fact that must be decided by a jury.  See Gomez

v. Lozano, 839 F. Supp.2d 1309, 1323 (S.D. Fla. 2012)(citing Ansley v. Heinrich, 925 F.2d

1339, 1341 (11th Cir. 1991)); Cirou v. Basler, 432 So. 2d 628, 629 (Fla. 3d DCA 1983).

Therefore, the Court denies the City's motion for summary judgment on the battery claim.

        **C.  Negligence**

        Plaintiff asserts a negligence claim against the City due to the officers' alleged "fail[ure]

to provide or obtain medical care for the Plaintiff despite the Plaintiff's obvious injuries."  (Doc.

No. 19).  Specifically, Plaintiff contends that the officers acted negligently by: (1) representing

to the paramedics at the scene that Plaintiff was ok and did not need medical treatment, (2)

refusing to remove Plaintiff's handcuffs so the paramedics could adequately examine his

injuries, and (3) delaying medical treatment by not driving him directly to the jail after he was

arrested.

        In order to prove a negligence claim, Plaintiff must establish four elements: (1) a duty,

(2) a breach of the duty, (3) causation, and (4) damages.  See Santana v. City of Hialeah, 2009

WL 6635306, at *4 (S.D. Fla. Nov. 30, 2009)(citation omitted).  With regard to the duty owed to

Plaintiff:

> Florida law is clear insofar as it imposes upon police officers and prison officials a duty to use reasonable care to ensure the safety of persons within their custody.  This common law mandate is set forth in the Restatement of Torts (Second) § 314A, and has been interpreted by Florida courts to require that "when a person detained by the police manifests such symptoms as would place a reasonable person on notice that the inmate is in need of medical attention, the police are bound to take steps that are reasonable under all relevant circumstances to obtain such care."  However, where a prisoner or arrestee is sick or injured, officers "will seldom be required to do more than give such first aid as [they] reasonably can, and take reasonable steps to turn the sick person over to a physician, or to those who will look after the person and see that medical assistance is obtained."

Id. at *4-5 (internal citations omitted).

Based on the above, one of the issues before the Court is whether the officers acted

reasonably to obtain medical treatment for Plaintiff, given that Plaintiff contends that the officers

(1) represented to the paramedics at the scene that Plaintiff was ok and did not need medical

treatment, (2) refused to remove Plaintiff's handcuffs so the paramedics could adequately

examine his injuries,[11] and (3) delayed medical treatment by not driving him directly to the jail

after he was arrested.  However, whether the officers acted reasonably is not dispositive,

because, as the City argues, even if the officers did not act reasonably, Plaintiff has not shown

that he was damaged by the delay in getting to the hospital to receive adequate medical

treatment.

Plaintiff has failed to respond to the City's argument that he cannot establish the damages

---

[11]The Court notes that in connection with the officers' motion for summary judgment, the Court concluded that there was no evidence regarding which officer at the scene refused the paramedics' request that Plaintiff's handcuffs be removed.

element of his negligence claim.  The Court agrees with the City that Plaintiff has failed to show

that any of the injuries that Plaintiff has sustained were due to anything other than the force that

was used to arrest him.  In fact, Plaintiff does not specifically allege damage caused by the

alleged negligence in his amended complaint, and instead, he states that "[a]s a proximate result

of the assault and battery committed by [the officers], Plaintiff has sustained permanent injuries."

(Doc. No. 19, ¶ 105).  As such, Plaintiff's negligence claim against the City fails, and the City is

entitled to summary judgment on this claim.

**IV.  Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that the City's Motion for Summary

Judgment (Doc. No. 43) is **GRANTED IN PART AND DENIED IN PART**:

(1)    The motion is granted as to Plaintiff's § 1983 and negligence claims; the motion

is denied as to Plaintiff's assault and battery claim.

(2)    This case is set for a pretrial conference on February 4, 2014 at 8:30 a.m., and the

parties' joint pretrial statement must be filed by ***January 30, 2014***.

**DONE AND ORDERED** at Tampa, Florida, this 23rd day of January, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record

23